MINER, Judge,
dissenting.
In affirming the trial court’s finding that the remaining part of section 408.706(10), Florida Statutes, (1993), after the severance of a portion thereof by the trial court, does not impermissibly burden interstate commerce in violation of the Commerce Clause of the U.S. Constitution, the majority adopts the final judgment on appeal as the opinion of this court. Since I cannot concur in the trial court’s holding or the majority’s affir-mance of that finding, I am obliged to dissent, respectfully. Before setting out the reasons for my disagreement, I believe it helpful to place the controversy at bar in some orderly perspective with a brief overview of Florida’s somewhat complex and de-tañed statutory scheme of health care administration.
In 1992, the legislature created the Agency for Health Care Administration (agency) within the Department of Professional Regulation (DPR) and gave the new agency broad responsibility and authority to coordinate the delivery of health care to Florida’s citizens. Regulation of most of the health-related professions previously lodged in the DPR and administration of many of the programs theretofore operated by the Department of Health and Rehabilitative Services were transferred to the agency. See § 20.42, Fla. Stat. (Supp.1992). In fleshing out the organizational structure of the new agency, Florida was divided up into eleven “health service planning districts”, each headed by a “local health council” charged with, among other things, development of a district health plan consistent with the objectives of the state health plan to be developed by the agency. See generally §§ 408.032-408.40, Fla.Stat. (1993).
A pivotal component of the state’s health care delivery system was the establishment of “community health purchasing alliances” (CHPA’s) as a group purchasing mechanism designed to insure access to high quality, affordable health care for all Floridians without regard to place of residence and at the lowest possible cost. Each CHPA is co-terminus with one of the eleven health service planning districts and specifically designed to serve members, whose membership is voluntary, who are small employers, state employees, and dependents, Medicaid recipients, MedAccess and Medicaid buy-in program participants and others. See § 408.702, et seq., Fla.Stat. (1993).
Under the state health plan as provided for in Chapter 408, the entity that actuañy delivers health services to CHPA members is denominated an “accountable health partnership” (AHP). An AHP is defined as “an organization that integrates health care providers and facilities and assumes risk in order to provide health care services ... ”. An AHP may be created by health care providers, health maintenance organizations and health insurers and is required to be certified by the agency upon a showing that it is able to meet statutory requirements, including having the proper licenses, demonstrating the capacity to administer the health plan it offers, and having the ability to recruit and retain minority health care providers. Importantly, to earn the designation of AHP, the organization must demonstrate that it has the ability to insure CHPA members adequate access to providers of health care, including geographic avañability and adequate numbers and types of such providers.[5]
In order to provide high quality, low cost health services to its members, CHPAs issue requests for proposals from among certified AHP’s within their service areas. When responsive proposals are received, the CHPAs prepare a comparison sheet using the detaüs of the various plans and submit the comparison sheet to its membership. Small business employers with 30 or fewer employees are required to review the material received *141 from the CHPA and offer its employees at least two plans from which to choose. Employers with more than 30 employees are required to submit at least three plans to its employees. § 408.703(5), Fla.Stat. Important to note is that AHP’s can only deal through CHPAs and that competition is the fuel that drives the mechanism that delivers health care services to CHPA enrollees.
The nub of the instant controversy centers around the enactment by the legislature of section 408.706(10), Florida Statutes (1993). That section, added during the waning hours of the 1993 legislative session,[6] singles out providers of prescribed medicine services for treatment not accorded to any other type of health care provider. In pertinent part, subsection (10) provides that if an AHP has entered into a contract for prescribed medicine service with a provider, an individual who otherwise would purchase his or her prescribed medications from the contract provider may purchase such medicine from an “independent pharmacy” if such pharmacy will provide the medication at a rate “equal to or less than” the negotiated contract price. An “independent pharmacy” “means a pharmacy facility which is not part of a group of affiliated pharmacy facilities which are under common ownership directly or indirectly in which the group has greater than twelve pharmacy facilities in the state or has directly or indirectly any interest in any facilities licensed under another state’s laws for the purpose of providing prescribed medicine services_” (Emphasis added.)
Thus, it can be seen that subsection (10) references two discrete markets — the prescribed medicine contract market in which all pharmacy facilities and chains, intrastate or interstate, which are in compliance with Chapter 465, Florida Statutes, are permitted to compete and the alternative or “equal to/less than” market which is open only to “independent pharmacies”, which term excludes, by definition, all or almost all interstate pharmacy stores and the few intrastate pharmacies selling prescription drugs from more than twelve outlets.
With the enactment of section 408.706(10), appellants filed suit for declaratory judgment seeking a determination of the constitutionality of that section under the Commerce Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Appellants also sought permanent injunctive relief against the enforcement of that section. When discovery was completed, both appellants and appellee moved for summary judgment. After a hearing, the trial court granted appellants’ motion in part and denied it in part. The court found that the portion of the contested statute which prohibited pharmacies licensed under the laws of another state from competing in the “equal to/less than” prescription medicine market created by section 408.706(10) violated the Commerce Clause because it had “no valid purpose unrelated to economic protectionism....”[7] With respect to the other contested part of subsection (10) defining “independent pharmacy”, the trial court ruled that such was “not clearly discriminatory” and hence did not violate the Commerce Clause. Notwithstanding that the numerical limitation language deemed by the trial court to be non-diseriminatory denied almost all interstate pharmacy companies the opportunity to compete for business in the “equal to/less than” market, the trial court concluded that the numerical limitation portion of subsection (10) regulated evenly because some intrastate pharmacy companies were also excluded from the alternative market. In sum, the court found that section 408.706(10) was the result of legislative “line drawing” and that section 408.706 “as a whole” did not discriminate against appellants under either the Commerce Clause or the Equal Protection Clause of the Fourteenth Amendment. This appeal then ensued.
The record below and on appeal reflects that at the time section 408.706(10) was enacted, some 1,950 pharmacy stores were sell *142 ing prescription medicines in Florida.[8] Of this total, 239 were operated by 45 companies that did not do business outside Florida. On the interstate side of the pharmacy store ledger, 18 companies operated 1,775 of Florida’s pharmacies. Thus, when the contested statute was adopted, almost 9 out of 10 pharmacy stores in this state were operated by interstate pharmacy companies.
Prior to the enactment of section 408.706(10), any pharmacy store or chain, interstate or intrastate, which was in compliance with Chapter 465, Florida Statutes, was free to contract with any delivery entity to provide prescription medicine services. Those same pharmacy stores and chains are yet free to do so. Additionally, there is nothing in Florida’s statutory health delivery plan or implementing rules that would preclude an AHP from entering into multiple contracts with prescription medicine providers, large or small, to serve CHPA members within the several health service planning districts. Thus, it is not prescription medicine contract market exclusion that is in controversy in this appeal but rather the provisions in section 408.706(10) that deny to the owners of 9 out of 10 Florida pharmacies the opportunity to compete in the new prescription drug market specifically created in subsection (10). As enacted, subsection (10) would bar all interstate pharmacies from the “equal to/less than” market. After the trial court severed the absolute bar language from the statute as “economic protectionism”, the numerical store limitation language that remained would permit only 23 stores in Florida owned by interstate chains to compete while excluding 1752 Florida stores owned by interstate operations. By way of contrast, of the 230 pharmacy stores doing business only in Florida, 7 out of 10 may compete in the subsection (10) market.
The numerical limitation language contained in subsection (10) was found not to impermissibly burden interstate commerce because it visited “its effect on both interstate and local business” and because it was “narrowly drawn,” it could survive constitutional scrutiny. Otherwise stated, the trial court reasoned that as long as some burden was imposed on intrastate commerce, any burden on interstate commerce was incidental and could be justified. For this proposition, the court cited Lewis v. BT Investment Managers, Inc., 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980). I do not read Lems as supportive of the trial court’s rationale. In that case, the supreme court expressly held that “legislation that visits its effects equally upon both interstate and local business may survive constitutional scrutiny if it is narrowly drawn.” Lewis, 447 U.S. at p. 36, 100 S.Ct. at p. 2015. The question then is whether subsection (10) burdens interstate and intrastate businesses equally. I believe it clearly does not. Instead of operating evenhandedly vis-a-vis the businesses affected, the numerical cap imposed by this subsection eliminates not all but 98.7% of all interstate competition from the “equal to/less than” prescription medicine market. At the same time, the numerical cap permits 66.9% of the Florida-sale-only pharmacies to compete in this market. In short, because of the numerical cap on sales outlets, of the almost 2,000 pharmacy stores in Florida, only 183 qualify for the designation “independent pharmacy.” So, as I see it, this is hardly the type of even-handed application required by Lewis. See also Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). Moreover, a careful reading of Lewis persuades me that the effect of the statute involved there is analogous to the numerical cap language here. In Lewis, the statute under attack as violative of the Commerce Clause prohibited ownership of local investment or trust businesses by companies with a certain business organization and purpose whose principal places of business were outside Florida. Inter alia, the supreme court found that the statute there involved “discriminates among affected entities according to the extent of their contacts with the local economy.” The numerical cap contained in section 408.706(10) does no less. Considerations of economic protectionism of Florida based pharmacy companies aside, I believe that subsection (10) likewise impermissibly discriminates among and between interstate *143 operations based upon their contacts with Florida’s economy.
For purposes of Commerce Clause analysis, a state statute may regulate interstate commerce by express terms or through its practical effect and design. C & A Carbone, Inc. v. Town of Clarkstown, — U.S.-, -, 114 S.Ct. 1677, 1684, 128 L.Ed.2d 399, 410 (1994). This appears true of the last minute language added in subsection (10), which both expressly (in the language struck by the trial court) and indirectly (in the numerical cap language) regulates interstate commerce. The principal focus of Commerce Clause inquiry must be the practical operation of the statute, because the validity of the state law must be judged by its probable effects. Lewis, supra. All parties to this appeal agree with this proposition. Appellants have established that the “equal to/less than” market is all but completely closed to interstate companies and benefits Florida businesses almost exclusively. The state’s argument that the market created by subsection (10) is small compared to the larger contract market is, in my view, unavailing. It is the right to compete that is determinative, not the size of the market. “The volume of commerce affected measures only the extent of the discrimination; it is of no relevance to the determination whether a state has discriminated against interstate commerce.” Wyoming v. Oklahoma, 502 U.S. 437, 455,112 S.Ct. 789, 801,117 L.Ed.2d 1,23 (1992).
In Carbone, supra, the Supreme Court made clear that a statute is no less discriminatory because both in-state or in-town businesses are covered by a prohibition. Carbone — U.S. at-, 114 S.Ct. at 1682, 128 L.Ed.2d at 408. Discrimination against interstate commerce in favor of local business is per se invalid except in a narrow case where the state can show “under rigorous scrutiny” that it has no other means to advance a legitimate local interest. The state has made no such showing on the record before us.
Appellee argues also that the statutory framework actually favors interstate commerce in the contracting for prescription medicine services and that this somehow justifies the exemption for “independent pharmacies” with respect to the alternative market. In adopting the final summary judgment on appeal as this court’s opinion, the majority necessarily concurs in the trial court’s determination that the numerical cap is not discriminatory when the state health plan is considered “as a whole”. On page 4 of the majority opinion at footnote 2, the court impliedly disagrees with appellants’ citation of Associated Industries v. Lohman, — U.S. -, 114 S.Ct. 1815, 128 L.Ed.2d 639 (1994), as calling for a more limited approach than that adopted by the trial court. In my view, the majority misreads Lohman. While it is true that Justice Thomas looked at separate statutes to determine whether the taxing scheme there involved violated the Commerce Clause, the comparison that he made was necessary to the determination of whether the tax was unconstitutional. The Lohman court was very clear that the discrimination in part of the operation of the tax scheme could not be used as a kind of offset in regard to advantages given interstate commerce under other parts of the taxing scheme.
We have never suggested, however, that patent discrimination in part of the operation of a tax scheme, not directly justified under any theory such as the compensatory tax doctrine, can be rendered inconsequential for commerce clause purposes by advantages given to interstate commerce in other facets of a tax plan or in other regions of state.
Lohman, — U.S.-,-, 114 S.Ct. 1815, 1822, 128 L.Ed.2d 639, 648 (1994). Whether or not a statute offends the Commerce Clause must be limited to an examination of the effect of the offending language. Whether interstate companies may or may not be favored in the rest of a statutory scheme is, in my view, irrelevant.
Both appellee and the trial court’s final summary judgment express concern that if the exemption for “independent” pharmacies were eliminated, the competition in the contract market would decrease because all prescription medicine providers would be allowed in the alternative market. Such concern is unclear to me when it be remembered *144 that the trial court severed that part of the exemption that directly discriminated against interstate prescription medicine providers. If the numerical language is found violative of the commerce clause, as I believe it must be, section 408.706(10) would have to be stricken in its entirety, eliminating both the exemption for independent pharmacies and the market to which it gave birth. As a result, there would be increased competition among pharmacy companies for AHP contracts to provide this service. Because this part of subsection (10) remaining that relates to the non-contract market and the remaining portion of the definition of “independent pharmacy” are so inextricably interwoven, there could be no further selective severing that would re-write subsection (10) so that the “equal to/less than” market would survive and appellants would be permitted to participate.
Appellee also seeks to justify the numerical cap as being protective of small business (as opposed to local business). If such be the case, one looks in vain through the statutes comprising the state’s health care delivery system for any evidence of legislative intent to afford such protection. Moreover, I find nothing in the record suggesting that pharmacy companies, interstate or intrastate, which operate fewer than 13 outlets in Florida are small businesses requiring the type of protection from competition that section 408.706(10) provides. Had protection of small businesses been a or the motivating factor underlying enactment of subsection (10), it seems likely that the legislature would have referenced section 288.703(1), Florida Statutes, which defines “small business”. As noted above, there is no statutory or rule prohibition against AHP’s contracting for pharmacy services with an interstate chain such as, say, Eckerds, and also contracting with a so-called “mom and pop” drugstore to assure access to this health care service, particularly in the rural or underserved areas of a health service planning district.
To conclude, I am reminded of a timeless and astute observation made by a principal character in a Broadway musical of several seasons ago that whether the pitcher hits the stone or the stone hits the pitcher, it’s going to be bad for the pitcher. Whether the provisions of a state statute directly and expressly discriminate against interstate commerce or do so indirectly through the use of some artificial control device, both of which provisions were at play in the ease at hand, interstate commerce is no less imper-missibly burdened. The trial court correctly struck the former language; in my view and with all deference to the able trial judge, and my colleagues, he should have struck all of section 408.706(10).

. Applicants for AHP designation are responsible for contracting with medical service providers and then proving to the agency that it can serve the plan it offers. No numerical limits on the numbers and types of providers an AHP must have to meet the demands of the plan it offers is prescribed by statute. The contracting process and contract content of an AHP with its providers is up to the contracting parties. In its application for designation as an AHP, the applicant organization is required to list its contractual relationships that will be used to satisfy statutory requirements. These include capacity to administer, ability, experience and structure and the adequacy of providers and access to those providers.

. Since no legislative histoiy accompanies subsection (10), it is unclear what the legislature intended to accomplish by including this last minute provision.

. The trial court severed this part of subsection (10) from the remainder and enjoined the state from enforcing same. No cross-appeal was taken from this ruling.

. This figure accords with appellants' records.